UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHEVOR POMPEY,

*Plaintiff*,

v.

COUNTY OF WESTCHESTER, JOHN
NONNA, *in his individual and professional
capacity*, *and* BERTINA CAPUANO, *in her
individual and professional capacity*,

*Defendants*.

---

No. 23-CV-9337 (KMK)

<u>ORDER & OPINION</u>

<u>Appearances</u>:

Tanvir H. Rahman, Esq.
Filippatos PLLC
White Plains, NY
*Counsel for Plaintiff*

Lalit Kumar Loomba, Esq.
Steven Joseph Bushnell, Esq.
The Quinn Law Firm
White Plains, NY
*Counsel for Defendants*

Irma Wheatfield Cosgriff, Esq.
Westchester County Attorney's Office
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Chevory Pompey ("Plaintiff") brings this Action against the County of Westchester, John

Nonna ("Nonna"), and Bertina Capuano ("Capuano") (collectively, "Defendants"), alleging

claims of discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964

("Title VII"), as amended, 42 U.S.C. §§ 2000e, et seq., 42 U.S.C. § 1981 ("Section 1981"), and

the New York State Human Rights Law ("NYSHRL"), New York Executive Law §§ 290, et seq. (*See generally* Am. Compl. (Dkt. No. 11).)  Before the Court is Defendants' Motion for Summary Judgment (the "Motion").  (*See* Not. of Mot. (Dkt. No. 53).)  For the reasons discussed below, Defendants' Motion is denied in part and granted in part.

I.  Background

A.  Factual Background

The following facts are taken from the Parties' statements pursuant to Local Civil Rule 56.1, (*see* Defs' 56.1 Statement ("Defs' 56.1") (Dkt. No. 54); Pl's 56.1 Statement ("Pl's 56.1") (Dkt. No. 61); Defs' 56.1 Response Statement ("Defs' 56.1 Resp.") (Dkt. No. 71); Pl's 56.1 Response Statement ("Pl's 56.1 Resp.") (Dkt. No. 61)), as well as admissible record evidence. The facts are recounted "in the light most favorable to" Plaintiff, the non-movant.  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (citation and quotation marks omitted). The facts as described below are in dispute only to the extent indicated.

Plaintiff is a Black man who was employed as an assistant county attorney by the Westchester County Law Department ("WCLD" or "Law Department") from June 24, 2004, to Plaintiff's resignation on February 24, 2023.  (Defs' 56.1 ¶¶ 1–2, 34, 42.)  Attorney positions in the WCLD are, from lowest to highest rank:  Junior Assistant County Attorney, Assistant County Attorney, Senior Assistant County Attorney ("SACA"), Associate County Deputy, Deputy County Attorney, Assistant Chief Deputy County Attorney, Chief Deputy County Attorney, and County Attorney.  (*Id.* ¶ 18.)  WCLD has four bureaus:  Litigation; Appeals, Opinions, and Legislation; Contracts and Real Estate; and Family Court.  (*Id.* ¶ 19.)  The Family Court Bureau ("FCB") has three units:  the Juvenile Delinquency Unit; the Abuse and Neglect Unit; and the Child Support Unit ("CSU").  (*Id.* ¶ 22.)  Plaintiff was initially assigned to the FCB but worked

2

primarily for a supervisor in the Litigation Bureau for his first two years at WCLD.  (*Id.* ¶¶ 36–37.)  Plaintiff then worked for a year in the Abuse and Neglect Unit, after which he transferred to the CSU, in which he remained until his resignation.  (*Id.* ¶¶ 38–39.)  Elizabeth Barbanes ("Barbanes") was Plaintiff's first supervisor in the CSU, and she was replaced in 2021 by Shelly Marchese ("Marchese").  (*Id.* ¶¶ 40–41.)

From 2009 to 2017, there were "very few, if any, promotions within the WCLD."  (*See id.* ¶¶ 17, 45.)  Multiple Black attorneys have been promoted over the last two decades.  (*See id.* ¶¶ 46, 49.)  Plaintiff first applied for a promotion to SACA in 2015 by submitting his resume to Wayne Humphrey, a Black man who was the head of the FCB until 2019.  (*Id.* ¶¶ 21, 51, 54.)  Plaintiff interviewed for the position, which was eventually given to Marissa Carbone, a SACA in the Litigation Bureau.  (*Id.* ¶ 52.)  In late 2019, Nonna asked bureau heads to recommend attorneys for promotion.  (*Id.* ¶ 53.)  Humphrey recommended promoting Barbanes and Marchese, but did not recommend Plaintiff for a promotion.  (*Id.* ¶ 56.)  Capuano was hired as head of the FCB in February 2020.  (*Id.* ¶ 20.)  In late 2020, 2021, and 2022, Nonna asked for promotion candidates.  (*Id.* ¶¶ 65, 92, 99.)  Each year, Capuano responded with a memo describing attorneys that she recommended for promotion.  (*Id.* ¶¶ 67, 92, 99.)  Plaintiff disputes that these memos were "reasoned" and that Capuano's ratings were genuine.  (*See, e.g.*, Pl's 56.1 Resp. ¶¶ 72, 85, 106.)  Plaintiff also disputes Defendants' recitation and characterization of his performance evaluations for 2020, 2021, and 2022.  (*See, e.g.*, *id.* ¶¶ 89, 97, 110.)

In April 2022, Plaintiff, upon learning that an attorney in the Contracts and Real Estate Bureau was going to retire, emailed the head of the bureau, Tami Altschiller ("Altschiller"), expressing an interest in transferring.  (Defs' 56.1 ¶ 114.)  The position was not a promotion; if Plaintiff had been transferred, he would have kept the same rank and salary.  (*Id.* ¶ 126.)

Plaintiff wrote: "If you ever need a contracts trainee, I would be interested in helping out, especially with Family Court related stuff. Practically, all of my experience is in Family Court, but I am a fast learner and (mostly) pleasant to work with." (*Id.* ¶ 115; Decl. of Lalit K. Loomba ("Loomba Decl."), Ex. FF (Dkt. No. 56-32).) Plaintiff wished to transfer because it would make him more marketable for a private sector position and because he believed he would be promoted faster in the Contracts and Real Estate Bureau. (*See* Defs' 56.1 ¶ 117.) On April 27, 2022, Plaintiff met with Altschiller, Nonna, and Stavey Dolgin-Kmetz ("Dolgin-Kmetz"), the Chief Deputy County Attorney. (*Id.* ¶ 118.) Altschiller and Dolgin-Kmetz both thought the meeting went well but noted Plaintiff's lack of contracts experience. (*Id.* ¶¶ 119–20.) The position was eventually given to a white woman. (*Id.* ¶ 125.)

In June 2022, Plaintiff submitted an application including a cover letter and resume for a SACA position in the FCB. (*Id.* ¶ 128.) Connie Giamei ("Giamei") in the Human Resources Department confirmed receipt of the application and said that she had forwarded his materials to the Law Department. (*Id.* ¶ 129.) Giamei testified that she had not actually forwarded Plaintiff's materials and that this was an oversight. (*Id.* ¶ 130–31.) Plaintiff disputes this and claims that "[i]t was more likely than not that [] Giamei in fact forwarded [his] application for the [SACA] position to the WCLD." (Pl's 56.1 Resp. ¶ 130.) Plaintiff also disputes Nonna and Capuano's testimony that they did not know about Plaintiff's June 2022 application until December 2022. (*Id.* ¶¶ 133–34.) In October 2022, Plaintiff learned that the position had been filled. (Defs' 56.1 ¶ 135.)

On December 7, 2022, Plaintiff sent an email to Nonna stating:

I would greatly appreciate some feedback from you regarding my interview with the Contracts and Real Estate Bureau on April 27, 2022, and my application for promotion to Senior Assistant County Attorney, submitted on June 15, 2022. I

4

> would also like to talk about some employment practices which may be unfair to
> certain groups at the Law Department.

(*Id.* ¶ 139; Loomba Decl., Ex. JJ ("Dec. 7 Email") (Dkt. No. 56-36).)  On December 15, 2022,

Plaintiff met with Nonna, Dolgin-Kmetz, and Capuano, where it was agreed that Plaintiff and

Capuano would create a roadmap to accelerate Plaintiff's promotion within the next three to six

months.  (Defs' 56.1 ¶ 145; Pl's 56.1 ¶ 329.)  Plaintiff and Capuano met the next day to discuss

the roadmap.  (Defs' 56.1 ¶ 146.)  The Parties dispute what was discussed at the meeting.  For

example, Defendants claim that Capuano told Plaintiff he should update his cases in Legal Files

and timely submit his billing records, (*id.* ¶ 147), while Plaintiff claims that he "was advised by

[] Capuano that her preference was that Legal Files notes and billing records be updated on a

daily basis as opposed to updating them at the end or middle of the month as had been

[Plaintiff's] practice," (Pl's 56.1 Resp. ¶ 147; *see also* Pl's 56.1 ¶ 331 (asserting that this was the

first time that Capuano had told Plaintiff of her preference)).  Capuano told Plaintiff that it was

not a requirement for promotion that an attorney supervise others or engage in community

outreach, but that community outreach "showed leadership."  (Pl's 56.1 ¶¶ 333–34.)  Plaintiff

and Capuano scheduled a follow-up meeting for December 22, 2022, where they would be joined

by Barbanes and make the roadmap "more specific."  (*Id.* ¶¶ 335–36.)  Following the December

16, 2022, meeting, Plaintiff learned that some number of white FCB attorneys were promoted.

(*Id.* ¶ 337.)

On December 21, 2022, Plaintiff sent an email to Nonna, copying five FCB attorneys,

John Vorperian, Stefanie Marvin, Danielle Larkin, Winston Makanju, and Wienia Jeanty

("Jeanty"), in which he wrote:

> It has come to our attention that the Family Court Bureau promoted a group of
> attorneys yesterday.  The attorneys who were promoted are dedicated, hardworking
> and well-deserving of the recognition.  Having said that, the group is composed of
> five (non-Jewish) White attorneys.    The current Family Court Bureau

administration has established a clear pattern of promoting (non-Jewish) White and Latino attorneys.  Black attorneys, Jewish attorneys and other attorneys who are members of protected classes (e.g., disabled/medical, age, gender) have been systematically excluded from promotion.

The attorneys who are copied on this email respectfully request a meeting with you to discuss ways to rectify this situation without litigation.  We are dedicated public servants and our goal is to improve the work environment at the Law Department, so that we can better serve the needs of the people of Westchester.

(Loomba Decl., Ex. LL (Dkt. No. 56-38).)  Nonna forwarded the email to Capuano, Dolgin-Kmetz, and Fred Sullivan ("Sullivan"), head of the Litigation Bureau.  (*See* Declaration of Tanvir Rahman ("Rahman Decl."), Ex. 17 (Dkt. No. 62-17).)  Capuano discussed the email with Nonna, Dolgin-Kmetz, and Sullivan and decided "not to meet with [Plaintiff], as he had threatened litigation."  (Rahman Decl., Ex. 3 (Dkt. No. 62-3) at 288:4–5; Defs' 56.1 ¶ 176; Pl's 56.1 ¶ 344.)  The Parties dispute why Capuano did not meet with Plaintiff on December 22, 2022.  (*See* Pl's 56.1 Resp. ¶ 176.)

The morning of December 22, 2022, Capuano emailed Plaintiff:  "I am aware of your recent email to the County Attorney dated 12/21/22 wherein you allude to litigation.  As such, I will not be meeting with you today."  (Loomba Decl., Ex. OO (Dkt. No. 56-41).)  Plaintiff replied a minute later:  "I understand.  Thank you."  (*Id.*)  Later that day, Nonna sent an email to Plaintiff and the five other attorneys, and blind copied Capuano, Dolgin-Kmetz, and Sullivan, in which he offered "to meet on an individual basis with any member of the group who would like to meet regarding issues they may have about promotion in their particular situation.  If anyone wishes to have a meeting in that regard, please contact Trudi Russell to schedule it."  (Loomba Decl., Ex. NN (Dkt. No. 56-40); Pl's 56.1 ¶ 356.)  On December 23, 2022, Plaintiff responded:  "Thank you for your reply.  I will follow-up with Trudi after the New Year."  (Loomba Decl., Ex. NN.)

On February 3, 2023, Plaintiff submitted a year-end memo to Nonna in which he stated:

As I expressed in both my December 7, 2022 and December 21, 2022 emails to you, there continues to be a disturbing pattern of discrimination within the Family Bureau. Since Bertina Capuano took over as Assistant Chief Deputy County Attorney, there have been approximately 15 promotions in the Bureau. This includes three employees who were promoted twice, and one employee who recently rejoined the Bureau as a Senior Assistant County Attorney after previously serving as an Assistant County Attorney. All of the employees promoted under the current administration are either white or Hispanic and mostly female. Black attorneys, Jewish attorneys and other attorneys who are members of protected classes (e.g., disabled/medical, age, gender) have been systematically excluded from promotion. . . . I had a meeting scheduled with Bertina on December 22, 202[2] to discuss a possible promotional opportunity. That meeting was canceled (retaliation?) after Bertina learned that I sent an email to you on December 21, 202[2] regarding discrimination with the latest group of promotees.

(Rahman Decl., Ex. 28 (Dkt. No. 62-28) at ECF 5.)

On January 19, 2023, Sullivan emailed Nonna and Dolgin-Kmetz that he was "happy to seriously consider [Plaintiff] for an [assistant county attorney] position in the Litigation Bureau." (Rahman Decl., Ex. 22 (Dkt. No. 62-22).) Plaintiff was not contacted about the position in the Litigation Bureau. (Pl's 56.1 ¶ 379.)

Beginning in July 2022, Plaintiff applied for jobs outside of the WCLD. (Defs' 56.1 ¶ 182.) For example, Plaintiff applied to and interviewed for jobs with the New York City Law Department ("NYCLD"). (*Id.* ¶ 186.) On February 15, 2023, Plaintiff accepted a written offer of employment from NYCLD. (*Id.* ¶ 188.) On February 17, 2023, Plaintiff applied for an open position as a SACA with the WCLD. (*Id.* ¶ 189.) Plaintiff gave his two-week's notice on February 24, 2023, and left his position on March 10, 2023. (*Id.* ¶¶ 190–91.)

On November 6, 2023, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Am. Compl. ¶ 8.)

B.  Procedural Background

Plaintiff initiated this Action on October 23, 2023. On January 15, 2024, Plaintiff filed an Amended Complaint. (*See* Am. Compl.) On January 8, 2025, the Court set a briefing

7

schedule for the instant Motion. (*See* Dkt. No. 40.) On February 13, 2025, Defendants filed the

Motion. (*See* Defs' Mem. in Supp. of Mot. ("Defs' Mem.") (Dkt. No. 58); Defs' 56.1.) On

March 25, 2025, Plaintiff filed his Opposition. (*See* Pl's Mem. in Opp. to Mot. ("Pl's Opp.")

(Dkt. No. 63); Pl's 56.1 Resp.; Pl's 56.1.) On April 11, 2025, Defendants filed their Reply. (*See*

Defs' Mem. in Reply ("Defs' Reply") (Dkt. No. 73); Defs' 56.1 Resp.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v.

John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In deciding whether to

award summary judgment, the court must construe the record evidence in the light most

favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v.

Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232,

240 (2d Cir. 2021) (same). "It is the movant's burden to show that no genuine factual dispute

exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also

Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4

(S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the non[-]movant's claim," in which case "the non[-]moving party must

come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order

to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d

114, 123 (2d Cir. 2013) (alteration, citation, and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would

be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

The Second Circuit has stated repeatedly that "an extra measure of caution is merited before granting . . . summary judgment in a discrimination action because direct evidence of discriminatory intent is rare." *See Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 228 (2d Cir. 2024) (quotation marks omitted). Because discriminatory intent is "elusive" in nature, *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015), "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination," *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)). That said, a plaintiff's "'reliance upon conclusory statements or mere allegations' will not suffice to defeat summary judgment." *Moll*, 94 F.4th at 228 (quoting *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002)). Summary judgment remains proper when "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which []he has the burden of proof." *Id.* (quoting *Celotex*, 477 U.S. at 322–23).

B. Analysis

Defendants move for summary judgment on all of Plaintiff's claims: Title VII discrimination and retaliation, Section 1981 discrimination and retaliation, and NYSHRL discrimination, retaliation, and aiding and abetting. (*See* Am. Compl.) The Parties agree that Plaintiff has also asserted a Title VII constructive discharge claim. (*See* Defs' Mem. 22; Pl's Opp. 24.) Defendants raise two issues that the Court must address before addressing the merits: Whether Plaintiff's declaration is a sham affidavit and whether Plaintiff has administratively exhausted his Title VII claims.

1. Plaintiff's Declaration

Courts note that "a non[-]moving party's self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment." *Adler v. Penn Credit Corp.*, No. 19-CV-7084, 2022 WL 744031, at *9 (S.D.N.Y. Mar. 11, 2022) (quoting *Wheeler v. Kolek*, No. 16-CV-7441, 2020 WL 6726947, at *8 (S.D.N.Y. Nov. 16, 2020)). Such self-serving declarations are also insufficient to create a genuine dispute of fact. *See Cestaro v. Prohaska*, 681 F. Supp. 3d 121, 125 (S.D.N.Y. 2023) ("A conclusory contradiction of undisputed evidence in a self-serving affidavit, unsupported by other evidence, is not by itself sufficient to create a genuine dispute of material fact." (citation omitted)). "Under the sham affidavit rule, 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.'" *Catalyst Advisors, LP v. Catalyst Advisors Invs. Glob. Inc.*, No. 21-CV-4855, 2024 WL 522751, at *11 (S.D.N.Y. Feb. 9, 2024) (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)).

The Second Circuit has "applied this principle to affirm a grant of summary judgment against a party who testified in his deposition that he was unable to

remember a particular fact, and then, in response to a summary judgment motion, submitted an affidavit claiming a recollection of events that would have raised an issue for trial."

*Robinson v. De Niro*, 739 F. Supp. 3d 33, 124 (S.D.N.Y. 2023) (quoting *Kennedy v. City of New York*, 570 F. App'x 83, 84–85 (2d Cir. 2014) (summary order)).

In Opposition, Plaintiff submits a declaration. (Rahman Decl., Ex. 18 ("Pl's Decl.") (Dkt. No. 62-18).) Defendants argue that the Court should disregard the declaration because it contradicts prior testimony and is designed to create disputes of material fact. (Defs' Reply 2–3.) Plaintiff previously testified at a Section 50-h hearing that he had "heard stereotypical language about [B]lack attorneys, [B]lack people in general, but no specific slurs." (Reply Declaration of Lalit K. Loomba, Ex. UU (Dkt. No. 70-6) at 88:9–11.)[1] Plaintiff also testified he had "heard [B]lack attorneys being referred to as lazy, and [he had] heard [B]lack attorneys and also [B]lack judges being referred to as dumb—unintelligent." (*Id.* at 88:14–17.) Plaintiff further testified he had not been called lazy, dumb, or unintelligent to his face. (*See id.* at 88:18–89:7.) Plaintiff could not "recall specific names" of people who had made such comments but had "heard people in supervisory positions make derogatory comments . . . which [he] perceived

---

[1] Section 50-h states:

Wherever a notice of claim is filed against a city, county, town, village, fire district, ambulance district or school district the city, county, town, village, fire district, ambulance district or school district shall have the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made, which examination shall be upon oral questions unless the parties otherwise stipulate . . . . The action . . . may not be commenced until compliance with the demand for examination if the claimant fails to appear at the hearing or requests an adjournment or postponement beyond the ninety[-]day period.

N.Y. Gen. Mun. Law § 50-h(1), (5). Plaintiff testified at a Section 50-h examination on August 21, 2023. (*See* Ex. UU at ECF 2.)

as being racially based." (*Id.* at 89:10–15.)  The bulk of Plaintiff's declaration concerns his "witness[ing] and observ[ing] [his] supervisor, [Barbanes], engage in countless discriminatory actions" between 2006 and 2022.  (Pl's Decl. ¶ 2; *see also id.* ¶¶ 3–31.)  Defendants argue that Plaintiff has "submitted a declaration in which he suddenly recalls, and now claims, that [] Barbanes made an entire series of racially insensitive remarks" and that "[t]he declaration contradicts his prior testimony."  (Defs' Reply 3.)

The Court finds that it may properly consider the declaration.  While Plaintiff's "detailed recitation of events [at his Section 50-h deposition] . . . directly contradicts his inability (or unwillingness) to recall basic details of the incident[s]," *Pugh v. Casimir*, No. 18-CV-7350, 2021 WL 4463103, at *8 (E.D.N.Y. Sept. 29, 2021), it does not contradict the testimony provided at his deposition in this Action, (Rahman Decl., Ex. 1 (Dkt. No. 62-1) at 28:10–22 ("Q:  Did Ms. Barbanes ever use language, say racially derogatory language?  A:  Indirectly, yes. . . .  [S]he often made derogatory comments about the intelligence of [B]lack attorneys, [B]lack judges, and also the work ethic of [B]lack attorneys and [B]lack judges.")).  Drawing inferences in the non-movant's favor, as the Court must at this stage, it appears that the declaration is more akin to a "clarifi[cation] and elaborat[ion] on factual details provided in [Plaintiff's] [recent] testimony," as opposed to a sham affidavit.  *Wongsing v. Wal-Mart Real Est. Bus. Tr.*, No. 20-CV-6029, 2021 WL 5304310, at *7 (S.D.N.Y. Nov. 15, 2021); *see also Wilson v. N.Y. & Presbyterian Hosp.*, No. 21-CV-1971, 2022 WL 17587564, at *3 (2d Cir. Dec. 13, 2022) (holding that an affidavit that "provided clarification or elaboration" and that did not actually contradict earlier testimony was not a sham affidavit).

2. Title VII Administrative Exhaustion

"Exhaustion of administrative remedies through the EEOC is an essential element of the Title VII statutory scheme and, as such, a precondition to bringing such claims in federal court." *Gonzalez v. Sutton Park Ctr. for Nursing & Rehab.*, No. 23-CV-8788, 2025 WL 920607, at *5 (S.D.N.Y. Mar. 26, 2025) (quoting *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 437 (S.D.N.Y. 2023)); *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (same). "[B]efore filing a complaint in federal court, plaintiffs asserting Title VII . . . claims must first exhaust their administrative remedies by filing a complaint with the EEOC or the equivalent state agency." *Ashmeade v. Amazon.com*, No. 23-CV-4331, 2024 WL 4266391, at *10 (S.D.N.Y. Sept. 23, 2024) (alterations adopted) (quotation marks omitted) (quoting *Kaba v. Hope Home Care*, No. 23-CV-9512, 2024 WL 1679327, at *2 (E.D.N.Y. Apr. 18, 2024)). "The exhaustion requirement applies not only to causes of action but also to underlying factual allegations." *Kirkland-Hudson*, 665 F. Supp. 3d at 439 (quoting *Fanelli v. New York*, 51 F. Supp. 3d 219, 227 (E.D.N.Y. 2014)). The 300-day requirement "is analogous to a statute of limitations." *Eliav v. Roosevelt Island Operating Corp.*, No. 22-CV-9978, 2024 WL 196477, at *3 (S.D.N.Y. Jan. 18, 2024) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996)).

Plaintiff brings discrimination and retaliation claims under Title VII. (Am. Compl. ¶¶ 93–100.) The Parties seem to agree that Plaintiff filed his EEOC charge on November 6, 2023. (*See* Defs' Mem. 25 (citing Am. Compl. ¶ 8).) The Court's review of the record has not turned up the EEOC charge or a right-to-sue letter, but it will assume, as the Parties apparently

14

have, that Plaintiff's EEOC charge covers all causes of actions and factual allegations set forth in the Amended Complaint.[2]

Plaintiff filed an EEOC charge on November 6, 2023. (Am. Compl. ¶ 8.) Defendants argue that Plaintiff's discrimination and retaliation claims are barred to the extent they rely on factual allegations occurring more than 300 days prior to November 6, 2023—that is, January 10, 2023. (Defs' Mem. 25.) Plaintiff fails to engage with this argument—his response, in its entirety, is:

> Defendants are incorrect that Plaintiff does not have timely Title VII claims as his retaliation claims related to Defendants failure to consider his February 2023 SACA application and failure to provide him with the opportunity to transfer to the litigation bureau all accrued within 300 days of his EEOC filing. Moreover, Plaintiff's constructive discharge claim is measured from the date of his resignation, i.e., February 24, 2023, and thus is also timely for Title VII purposes.

(Pl's Opp. 26.) Plaintiff concedes that January 10, 2023, represents a time-bar to his Title VII discrimination claims. As for his retaliation claims, Plaintiff argues that his retaliation claims related to his February 2023 job application and "the opportunity to transfer to the [L]itigation [B]ureau" are timely. (*See id.*) This also appears to be a concession that his retaliation claim is

---

[2] "The Second Circuit has repeatedly held that the failure to exhaust administrative remedies is a precondition to bringing a Title VII claim in federal court, rather than a jurisdictional requirement that, like a statute of limitations, is subject to [equitable defenses]." *Oparaji v. Teachers' Ret. Sys. of City of New York*, No. 23-CV-5212, 2024 WL 3046120, at *5 (S.D.N.Y. June 18, 2024) (quotation marks omitted) (quoting *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489, 491 (2d Cir. 2018)); *see also Hardaway*, 879 F.3d at 491 (noting that those equitable defenses include "waiver, estoppel, and equitable tolling" (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982))). "[D]efendants have the burden of proof to establish that plaintiffs failed to exhaust their administrative remedies." *Oparaji*, 2024 WL 3046120, at *5 (citing *Hardaway*, 879 F.3d at 491). Here, Defendants do not raise any argument concerning the content of Plaintiff's EEOC charge. Accordingly, the Court deems any such argument waived. *Cf. Harris v. N.Y.C. Human Ress. Admin.*, No. 20-CV-2011, 2022 WL 3100663, at *5 n.7 (S.D.N.Y. Aug. 4, 2022) (finding that, because defendants had not made an argument that plaintiff's Rehabilitation Act was time-barred in relation to plaintiff's filing an EEOC charge, they had waived such an argument).

barred to the extent it relies on events that occurred before January 10, 2023. Even if he hadn't conceded, Plaintiff fails to actually respond to Defendants' arguments on these points, and so has abandoned his Title VII claims to the extent they rely upon factual allegations occurring before January 10, 2023. *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (deeming claims abandoned where plaintiff "fail[ed] to argue that they should survive [defendant's] motion for summary judgment" while arguing against the motion as to his other claims); *Cruz v. County of Rockland*, No. 21-CV-2073, 2023 WL 6199189, at *6 (S.D.N.Y. Sept. 22, 2023) ("[B]ecause [p]laintiff has failed to address [d]efendants' arguments concerning the merits of his state false arrest claim . . ., the Court deems this claim abandoned."); *Bryant v. Steele*, 462 F. Supp. 3d 249, 270 (E.D.N.Y. 2020) ("A party abandons a claim in the context of a summary judgment motion when she does not respond to arguments concerning that claim."), *aff'd sub nom. Bryant v. Iheanacho*, 859 F. App'x 604 (2d Cir. 2021).

The Court now turns to Plaintiff's claims.

<u>3. Discrimination</u>

Title VII prohibits discrimination against an employee based on that employee's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The NYSHRL echoes this prohibition and adds to it, prohibiting discrimination against an employee based on that employee's "age, race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence." N.Y. Exec. Law § 296(1). Finally, Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject

to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  The Second Circuit has construed this provision to prohibit employment discrimination on the basis of race.  *See Lauture v. Int'l Bus. Machs. Corp.*, 216 F.3d 258, 260–61 (2d Cir. 2000) (holding that Section 1981 covers claims of employment discrimination brought both by employees working under contract and at-will employees).

Claims of discrimination under all three statutes are analyzed pursuant to the familiar and well-known three-part framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 111 (S.D.N.Y. 2022) (citing *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74–75 (2d Cir. 2016)).

> Under this framework, at the summary judgment stage, a plaintiff must first demonstrate a prima facie case of employment discrimination by showing that: "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."

*Farmer v. Shake Shack Enters.*, 473 F. Supp. 3d 309, 324 (S.D.N.Y. 2020) (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019)); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (establishing the same criteria).  "The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal."  *Walsh*, 828 F.3d at 75 (quoting *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998)).  If plaintiff carries his prima facie burden, "[t]he burden of production then shifts to the defendant to offer a legitimate, non-discriminatory reason for the allegedly discriminatory conduct," and "[u]pon such a showing, the plaintiff must demonstrate that the reasons offered by the defendant are a mere pretext for discrimination."  *Farmer*, 473 F. Supp. 3d at 324 (citing *Littlejohn v. City of New York*, 795 F.3d 297, 307–08 (2d Cir. 2015)); *see also Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir.

2014) ("[T]he final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination.").

Plaintiff makes two types of discrimination claims—failure to promote and failure to transfer. As noted above, Plaintiff has conceded that discrimination claims accruing before January 10, 2023, are untimely. *See* supra Section II.B.2. Accordingly, the Court addresses in turn Plaintiff's discrimination claims under Section 1981 and NYSHRL.

### a. Failure to Promote

#### i. Legitimate, Non-Discriminatory Reason

Defendants do not contest for the purposes of the Motion that Plaintiff can establish a prima facie case of discrimination for failure to promote. (Defs' Mem. 17 n.1.) They argue that they have shown legitimate, non-discriminatory reasons for Plaintiff's not being promoted. Specifically, Defendants assert that the attorneys who were promoted in 2020, 2021, and 2022:

> (i) each received higher employee evaluation scores than Plaintiff ("top performer" vs. "strong performer"); (ii) did not struggle to comply with basic administrative mandates such as using Legal Files and making timely billing entries as Plaintiff did; and (iii) unlike Plaintiff, each brought something extra to the job that went beyond meeting the basic requirements.

(*Id.* 17.)

In 2020, Marchese, Danielle Grosso, Karen Beltran, Wanda Steinman, Noreen Rothman, and Jeanty were recommended for promotion in the FCB, and all but Jeanty were promoted. (Defs' 56.1 ¶¶ 70, 87.) The table below compares 2020 evaluation ratings for these six attorneys and Plaintiff.[3]

---

[3] A rating of 5 is "Significantly Exceeds Expectations (Exceptional)." A rating of 4 is "Exceeds Expectations." A rating of 3 is "Fully Meets Expectations."

| Category | Plaintiff | Marchese | Grosso | Beltran | Steinman | Rothman | Jeanty |
|---|---|---|---|---|---|---|---|
| Overall | Strong Performer | Top Performer | Top Performer | Top Performer | Top Performer | Top Performer | Top Performer |
| Business Ethics | 4 | 5 | 5 | 5 | 5 | 5 | 5 |
| Adaptability | 3 | 5 | 5 | 5 | 4 | 5 | 4 |
| Comm'ns & Presentations | 4 | 5 | 5 | 5 | 4 | 5 | 5 |
| Cooperation | 4 | 5 | 5 | 5 | 4 | 5 | 5 |
| Dependability | 4 | 5 | 5 | 5 | 5 | 5 | 5 |
| Working with Pub. Officials | 4 | 4 | 4 | 5 | 5 | 4 | 4 |
| Judgment | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| Negotiation Skills | 5 | 4 | 5 | 5 | 5 | 5 | 4 |
| Quality & Quantity | 4 | 5 | 5 | 5 | 4 | 5 | 5 |
| Managing Multiple Priorities | 4 | 5 | 5 | 5 | 4 | 4 | 5 |
| Self-Mgmt. | 4 | 5 | 5 | 4 | 4 | 4 | 5 |
| Compliance Mgmt. | 4 | 5 | 5 | 5 | 5 | 5 | 5 |

(*See* Dkt. Nos. 57-1 to -7.)

In 2021, Nicholas DeCicco and Holly Young were promoted in the FCB.  (Defs' 56.1 ¶ 92; Pl's 56.1 ¶ 248.)  The table below compares 2021 evaluation ratings for these two attorneys and Plaintiff.

| Category | Plaintiff | DeCicco | Young |
|---|---|---|---|
| Overall | Strong Performer | Top Performer | Top Performer |
| Business Ethics | 4 | 5 | 5 |
| Adaptability | 3 | 5 | 5 |
| Comm'ns & Presentations | 4 | 5 | 5 |
| Dependability | 4 | 4 | 5 |
| Judgment | 5 | 5 | 5 |
| Negotiation Skills | 5 | 5 | 5 |
| Managing Multiple Priorities | 4 | 5 | 5 |

(*See* Dkt. Nos. 57-8 to -10; 62-30.)

In 2022, Antoinetta Marmorato, Grosso, Marchese, Rothman, and Carl Bartol were promoted in the FCB.  (Defs' 56.1 ¶ 99; Pl's 56.1 ¶ 262.)  The table below compares 2022 evaluation ratings for these five attorneys and Plaintiff.

| Category | Plaintiff | Mamorato | Grosso | Marchese | Rothman | Bartol |
|---|---|---|---|---|---|---|
| Overall | Strong Performer | Top Performer | Top Performer | Top Performer | Top Performer | Top Performer |
| Business Ethics | 4 | 5 | 5 | 5 | 5 | 5 |
| Adaptability | 4 | 5 | 5 | 5 | 5 | 5 |
| Comme'ns & Presentations | 4 | 5 | 5 | 5 | 5 | 5 |
| Dependability | 3 | 5 | 5 | 5 | 5 | 5 |
| Judgment | 5 | 5 | 5 | 5 | 5 | 5 |
| Negotiation Skills | 5 | 5 | 5 | 5 | 5 | 5 |
| Managing Multiple Priorities | 4 | 5 | 5 | 5 | 5 | 5 |

(*See* Dkt. Nos. 57-11 to -16.)

In light of the ratings described above, which are accompanied by narrative evaluations of each applicant based on the enumerated categories, Defendants have clearly proffered legitimate, non-discriminatory reasons for declining to promote Plaintiff and have met their burden to produce evidence of the same. The record evidence, "if believed by a reasonable trier of fact, would allow a finding of no unlawful discrimination," *Jain v. Tokio Marine Mgmt. Inc.*, No. 16-CV-8104, 2018 WL 4636842, at *5 (S.D.N.Y. Sept. 27, 2018) (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001)), and so the burden shifts to Plaintiff to show that these reasons are a pretext for discrimination.

### ii.  Pretext

To show pretext, the plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *DiCesare v. Town of Stonington*, 823 F. App'x 19, 24 (2d Cir. 2020) (alterations in original) (quoting *Van Zant*, 80 F.3d at 714); *Mullins v. City of New York*, 626 F.3d 47, 53–54 (2d Cir. 2010) (same). More specifically, a plaintiff may show pretext "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's

20

proffered legitimate, [non-discriminatory] reasons for its action." *Palencar v. N.Y. Power Auth.*, 834 F. App'x 647, 651 (2d Cir. 2020) (quoting *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)); *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 430 (2d Cir. 2016) (same). "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Graziadio*, 817 F.3d at 430 (quoting *Kwan*, 737 F.3d at 846); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive." (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517 (1993)); *Pediford-Aziz v. City of New York*, 170 F. Supp. 3d 480, 486 (E.D.N.Y. 2016) ("From . . . 'implausibilities, inconsistencies, [and] contradictions in' the proffered reasons . . . one 'could conclude that . . . explanations [are] pretext.'" (alteration in original) (quoting *Kwan*, 737 F.3d at 846)).

Plaintiff raises a litany of grounds upon which he argues pretext is shown:  The performance evaluations "were themselves used as pretext to mask and justify promotion decisions" because they were issued after promotion decisions and because "Plaintiff consistently received lower scores in multiple categories in the evaluations despite receiving identical, or nearly identical, written comments and feedback," (Pl's Opp. 18–19 (emphasis omitted)); the evaluations actually demonstrate that Plaintiff was more qualified than candidates who received promotions, (*id.* 19–20); Plaintiff "did in fact bring something extra to the job beyond the basic requirements," (*id.* 21); participation in community outreach efforts were not referenced in Capuano's promotion recommendations, thereby calling into doubt the promotion decisions, (*id.* 22); "the FCB made mass promotions without ever posting the promotion or notifying anyone that promotions were even being considered," (*id.* 23); and "Capuano's

promotion recommendations were heavily influenced by [] Barbanes, who engaged in discriminatory conduct against Black individuals and males," (*id.*).

Plaintiff makes much hay from alleged inconsistencies in the ratings that Capuano gave and associated narrative comments and feedback. (*See* Pl's 56.1 ¶¶ 225, 233, 237–41, 251, 253 (alleging that Plaintiff and another attorney who was promoted had "virtually identical" comments despite Plaintiff receiving a lower rating than the other attorney).) Defendants argue that, to make a showing of pretext sufficient to defeat summary judgment, Plaintiff must "proffer evidence that his credentials were so superior to the person [promoted] that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" (Defs' Mem. 15 (quoting *Wood v. N.Y.C. Trans. Auth.*, 699 F. App'x 76, 77–78 (2d Cir. 2017) (summary order) (quoting *Byrnie*, 243 F.3d at 103)).) Defendants' reliance on *Wood* and *Byrnie* is "misguided" because the Second Circuit has explained that the standard elucidated in those cases "does not apply where a case [is] about more than a mere discrepancy in qualifications." *Jain*, 2019 WL 109400, at *1 (quotation marks omitted) (quoting *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 253–54 (2d Cir. 2014)). Here, Plaintiff "need not show that he was the far superior candidate," and evidence regarding any discrepancy in qualifications may retain some probative value "where there is other evidence of discriminatory intent." *Jain*, 2018 WL 4636842, at *6.

As noted by Defendants, Plaintiff's 56.1 Response Statement is far from a model of clarity and concision. However, the Court finds that Plaintiff has made a showing of pretext sufficient to defeat summary judgment. The theory goes like this: Plaintiff witnessed Barbanes, an intermediate supervisor, (Defs' 56.1 ¶ 40), make racially derogatory and disparaging remarks about Black and male attorneys in the FCB, (Pl's 56.1 ¶ 391). Capuano, in making promotion

recommendations to Nonna, relied entirely on recommendations of Barbanes and Mary Ann Reda, an Associate County Attorney. (*See, e.g.*, Pl's 56.1 ¶ 213 (asserting that "the recommendation [] Capuano wrote for [] Jeanty was verbatim what [] Barbanes wrote in support of [] Jeanty's promotion").)  Capuano's promotion recommendations, therefore, were tinged by Barbanes' discriminatory animus. (*See* Pl's Opp. 23.)  The Parties dispute each stage of this theory, but these disputes are sufficient to deny summary judgment. *See Rose v. N.Y.C. Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001) (discriminatory comments of plaintiff's supervisor, who did not have formal firing authority but who "had enormous influence in the decision-making process," constituted direct evidence of discrimination); *Zagaja v. Vill. of Freeport*, No. 10-CV-3660, 2013 WL 2405440, at \*12 (E.D.N.Y. June 3, 2013) (finding a dispute of material fact whether an intermediate supervisor "retaliated against plaintiff by failing to recommend her for the promotion and whether [the ultimate decisionmaker] simply deferred to [the intermediate supervisor] for the promotion decision"); *Sadki v. SUNY Coll. at Brockport*, 310 F. Supp. 2d 506, 513 (W.D.N.Y. 2004) (denying summary judgment where an individual who was not the final decisionmaker "harbored discriminatory animus toward plaintiff on account of his race, national origin, or religion[,] . . . had significant input into the decision whether to offer the position to plaintiff[,] . . . recommended that plaintiff not be selected for the position[,] and [that] recommendation was a motivating factor in the ultimate decision not to offer the position to plaintiff").

However, the Court's inquiry does not end there.  Plaintiff's theory rests entirely upon a finding of "cat's paw" liability.

> [T]he "cat's paw" metaphor . . . "refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who

does have such a motive and intended to bring about the adverse employment action."

*Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016) (quoting *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012) (Posner., J.)).  The Second Circuit has held that "the 'cat's paw' theory may be used to support recovery for claims of retaliation in violation of Title VII."  *Id.* at 272–73.  The Second Circuit has not addressed whether the cat's paw theory applies to Section 1981 claims brought under Section 1983.  Courts disagree as to the theory's applicability.  In *Natofsky v. City of New York*, No. 14-CV-5498, 2017 WL 3670037 (S.D.N.Y. Aug. 8, 2017), *aff'd on other grounds*, 921 F.3d 337 (2d Cir. 2019), the plaintiff brought a claim of discrimination pursuant to the Rehabilitation Act, which "require[s] a but-for analysis" as opposed to Title VII, which "permits a mixed-motives analysis," *id.* at *12 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)).  The court found that cat's paw liability could not "be extended into the Rehabilitation Act context" because, "while the bias of a non-decisionmaker may be . . . actionable . . . under Title VII, it is not by itself enough under the Rehabilitation Act, which requires impermissible bias to be the *sole* reason for the adverse employment action."  *Id.* (emphasis in original); *see also Zuro v. Town of Darien*, 432 F. Supp. 3d 116, 129 (D. Conn. 2020) (characterizing cat's paw theory as only being "applied to a limited number of distinct statutes").  However, the court in *Whitney v. Montefiore Med. Ctr.*, No. 21-CV-9623, 2023 WL 7386400 (S.D.N.Y. Nov. 8, 2023), reasoned that "[t]here is no charter in the text of the ADA and Rehabilitation Act (and comparable statutes) for a bright-line rule that would preclude liability on this theory," *id.* at *16.  The Court agrees with the analysis in *Whitney*—in particular, it is possible to imagine scenarios in which an intermediate supervisor's animus was a but-for cause of a failure to promote, as would be required under a Section 1981 failure to promote claim.  For example, an intermediate supervisor, who is tasked with recommending candidates for

promotion, refuses to select a candidate due to that candidate's race. "On these facts, the final

decisionmaker's rubber-stamp ratification . . . does not alter the fact that the 'trait actually played

a role in the employer's decisionmaking process and had a determinative influence on the

outcome.'" *Id.* (quoting *Gross*, 557 U.S. at 176). If the final decisionmaker had her own

unbiased reasons that were sufficient to justify the failure to promote, "the bias of an

intermediate participant would not support liability. But that presents a question of fact; it does

not support a categorical bar." *Id.* (citing *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 950 (10th

Cir. 2021)).

     Accordingly, the Court grants Defendants' Motion on Plaintiff's discrimination claim to

the extent it relies on Title VII and denies it with respect to Section 1981 and the NYSHRL.

     <u>b. Failure to Transfer</u>

     Plaintiff argues that there are disputes of material facts concerning his "failure to

transfer/hire" claim. (Pl's Opp. 23 n. 3.) Defendants argue that failure to transfer is not an

adverse employment action. (Defs' Reply 8.)

     "An adverse employment action is 'a materially adverse *change* in the terms and

conditions of employment.'" *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008)

(emphasis in original) (quoting *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d

Cir. 2004)). The Second Circuit has instructed that:

> To be materially adverse, a change in working conditions must be more disruptive
> than a mere inconvenience or an alteration of job responsibilities. Examples of
> such a change include termination of employment, a demotion evidenced by a
> decrease in wage or salary, a less distinguished title, a material loss of benefits,
> significantly diminished material responsibilities, or other indices unique to a
> particular situation.

*Id.* (quoting *Sanders*, 361 F.3d at 755); *see also Tolbert v. Smith*, 790 F.3d 427, 435 (2d Cir.

2015) (holding similarly). "[T]he denial of a lateral transfer or an additional assignment can

qualify as an adverse employment action if that transfer or additional assignment would have materially changed the terms and conditions of employment, such as by materially increasing the employee's pay or materially increasing the employee's opportunity for advancement." *Buon v. Spindler*, 65 F.4th 64, 82 (2d Cir. 2023). "However, to satisfy this standard, plaintiff is required to proffer objective indicia of material disadvantage; subjective, personal disappointment[] is not enough." *Bidot v. County of Suffolk*, No. 19-CV-3925, 2025 WL 1135049, at *7 (E.D.N.Y. Mar. 7, 2025) (quotation marks omitted) (quoting *Beyer v. County of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008)), *appeal pending*, No. 25-915 (2d Cir. Apr. 16, 2025). "To establish 'the adverse employment action necessary to make out a prima facie case' a plaintiff must 'proffer[] evidence from which a reasonable trier of fact could conclude that the transfer sought and denied would have involved an objective and significant improvement in the terms, conditions, or privileges of her employment." *Abalola v. St. Luke's-Roosevelt Hosp. Ctr.,* No. 20-CV-6199, 2022 WL 973861, at *8 (S.D.N.Y. Mar. 30, 2022) (quoting *Beyer,* 524 F.3d at 166).

Here, Plaintiff's transfer to the Contracts and Real Estate Bureau would not have been a promotion; rather, he would have kept his same rank and salary. (Defs' 56.1 ¶ 126.) Plaintiff wanted to transfer because he believed "that the Contracts Bureau was an easier path to being promoted" and the move could help him "pursue private practice in the future." (Loomba Decl., Ex. E (Dkt. No. 56-5) at 123:24–124:12.) Plaintiff has not, however, presented any evidence that the denial of his transfer caused "some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024). "[I]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action." *Kurtanidze v. Mizuho*

26

*Bank, Ltd.*, No. 23-CV-8716, 2024 WL 1117180, at *7 (S.D.N.Y. Mar. 13, 2024) (quoting

*Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)).  Accordingly, Defendants'

Motion is granted on Plaintiff's denial of transfer discrimination claim.  *See Bidot*, 2025 WL

1135049, at *7–8 (granting summary judgment on a "refusal to transfer claim" because plaintiff

"offer[ed] no evidence that there would be any difference in the terms, conditions, privileges, or

duties of his employment").  Accordingly, the alleged failure to transfer cannot support

Plaintiff's discrimination claim.

### 4.  Retaliation

"Title VII forbids an employer from discriminating against an employee because the

employee 'has opposed any practice made an unlawful employment practice by this subchapter,

or because []he has made a charge, testified, assisted, or participating in any manner in any

investigation, proceeding, or hearing under this subchapter.'"  *Farmer*, 473 F. Supp. 3d at 330

(alteration in original) (quoting 42 U.S.C. § 2000e-3(a)).  "The NYSHRL similarly makes it

unlawful for an employer to retaliate or discriminate against an employee because []he 'has

opposed any practices forbidden under this article or because . . . []he has filed a complaint,

testified[,] or assisted in any proceeding under this article.'"  *Id.* (alteration in original) (quoting

N.Y. Exec. Law § 296(7)).  "Additionally, the Supreme Court has held that Section 1981

'prohibits not only racial discrimination but also retaliation against those who oppose it.'"

*Alvarado*, 631 F. Supp. 3d at 116 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338,

355 (2013)).

"The burden-shifting framework laid out in *McDonnell Douglas* . . . governs retaliation

claims under both Title VII and the NYSHRL."  *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d

Cir. 2013) (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006)); *see*

*also Littlejohn*, 795 F.3d at 315 ("Retaliation claims under Title VII and [Section] 1981 are both analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework." (footnote omitted)).

> To make out a prima facie case of retaliation, a plaintiff must demonstrate that "(1) she engaged in a protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action."

*Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (italics omitted) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)). "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, non[-]discriminatory reason existed for its action." *Summa*, 708 F.3d at 125 (quoting *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)). "If the employer demonstrates a legitimate, non-discriminatory reason, then 'the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation.'" *Id.* (alterations omitted) (quoting *Raniola*, 243 F.3d at 625). "Significantly, a plaintiff alleging retaliation in violation of Title VII must show at the final step of the analysis that retaliation was a 'but-for' cause of the adverse action, not simply a 'substantial' or 'motivating' factor in the employer's decision." *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016) (quoting *Nassar*, 570 U.S. at 348).

Defendants argue that, even assuming that Plaintiff's December 21, 2022, email was a protected activity, Plaintiff has failed to demonstrate a materially adverse action or a causal connection between the protected activity and the adverse action. (Defs' Mem. 20.)

"To establish an adverse employment action for purposes of a retaliation claim, 'a plaintiff must show that a reasonable employee would have found the challenged action

materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Alvarado*, 631 F. Supp. 3d at 118 (quoting *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 224 (E.D.N.Y. 2014)). "The scope of actions that may be materially adverse for purposes of a Title VII retaliation claim is broader than those actions prohibited by Title VII's anti-discrimination provisions; the latter apply to the terms and conditions of employment, while the former 'anti-retaliation protection is broader and extends beyond workplace-related or employment-related retaliatory acts and harms.'" *Bowen-Hooks*, 13 F. Supp. 3d at 224–25 (quoting *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010). However, the Supreme Court has made clear that even in the retaliation context, "it is important to separate significant from trivial harms." *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006).[4]

Plaintiff asserts that the cancellation of his December 22, 2022, meeting with Capuano to discuss his promotion roadmap, Defendants' failure to consider his February 2023 job application, and their failure to inform him of the opportunity to transfer to the Litigation Bureau each constitute an adverse action. (Pl's Opp. 15–16, 26.) As discussed above, only the second and third alleged actions may be considered adverse. *See supra* Section II.B.2.

_____

[4] Plaintiff argues that he has a low hurdle to establish an adverse action, as evidenced by the Supreme Court's recent decision in *Muldrow v. City of St. Louis*, where it held, in the context of a Title VII discrimination claim, that a plaintiff alleging an involuntary transfer constituted an adverse action need not "meet a heightened threshold of harm," but rather they "must show some harm respecting an identifiable term or condition of employment." 601 U.S. at 353–55. Plaintiff points to this case as establishing a low hurdle which he clears. (*See* Pl's Opp. 16.) Plaintiff's reliance is misguided, as the Supreme Court itself noted the difference between its Title VII discrimination analysis in *Muldrow* and its Title VII retaliation analysis in *Burlington Northern & Santa Fe Railway Co. v. White*. *Muldrow*, 601 U.S. at 357–58 (holding that the Title VII "anti-retaliation provision . . . applies only when the retaliatory action is 'materially adverse,' meaning that it causes 'significant' harm.").

a.  December 22, 2022, Meeting

As noted above, *see* supra Section II.B.2, because Plaintiff failed to administratively exhaust his Title VII retaliation claim as it relates to this meeting, the Court considers the meeting only for the purposes of Plaintiff's Section 1981 and NYSHRL claims.  Plaintiff argues that the cancelation of the December 22, 2022, meeting "was effectively the end of Plaintiff's shot at ever being promoted," (Pl's Opp. 16), while Defendants argue that, the cancelation was not materially adverse because Nonna offered to meet with Plaintiff to discuss the issues raised in the email, (Defs' Mem. 21–22).

The December 22, 2022, meeting was a "roadmap" to "put [Plaintiff] in a position to be promoted . . . within three to six months."  (Pl's 56.1 ¶ 329; *see also id.* ¶ 351 ("The purpose of the December 22 meeting between [] Capuano and [Plaintiff] was to get the 'ball rolling' with respect to specific activities in which [Plaintiff] could participate to demonstrate leadership necessary in order for him to be promoted.").)  The meeting could fairly be considered akin to a training opportunity, the denial of which constitutes an adverse action.  *See Latif v. City of New York*, No. 20-CV-8248, 2024 WL 1348827, at *7 (S.D.N.Y. Mar. 28, 2024) (finding that the denial of training opportunities constituted an adverse employment action where promotions were contingent on training participation); *Krul v. DeJoy*, 705 F. Supp. 3d 5, 44 (N.D.N.Y. 2023) (noting that "the denial of training opportunities that may lead to promotional opportunities" can constitute an adverse action), *appeal dismissed* (2d Cir. June 3, 2024).  Defendants argue that the cancelation "was only temporary," and so was not an adverse action.  (*See* Defs' Mem. 21.)  But whether the cancelation was temporary is a disputed fact which precludes summary judgment, as the Court cannot hold as a matter of law that the cancelation of the meeting would not have dissuaded a reasonable worker from making or supporting a charge of discrimination.  Indeed, a

reasonable jury could find that the cancelation of a meeting intended to solidify a plan for promotion would dissuade a reasonable worker from making or supporting a charge of discrimination.  *See Trachtenberg v. Dep't of Educ.*, 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013) ("[T]he denial of professional training opportunities may constitute an adverse employment action . . .[w]here an employee can show 'material harm' from the denial, 'such as a failure to promote or a loss of career advancement opportunities.'" (quoting *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006)); *cf. de la Cruz v. N.Y.C. Hum. Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir. 1996) (finding that, while plaintiff's case was "quite thin," the question of whether an employment transfer "altered the terms and conditions of his employment in a negative way . . . would be a question of fact for trial").

Defendants also argue that there is no causal connection between the protected activity (the December 21, 2022, email) and the adverse action (the cancelation of the December 22, 2022, meeting.  (Defs' Mem 22.)  They argue that Plaintiff could have scheduled a meeting with Nonna in January 2023, and that Plaintiff's decision not to schedule that meeting "caused [the promotion roadmap process] to stop."  (*Id.*)  Construing the evidence in Plaintiff's favor, the temporal proximity between protected activity and adverse action of one day is clearly sufficient to raise an inference of retaliation.  *See Bamba v. U.S. Dep't of Homeland Sec.*, No. 22-CV-7407, 2024 WL 3924810, at *20–22 (S.D.N.Y. Aug. 23, 2024) (finding a gap of a few months as sufficient to demonstrate causation for plaintiff's prima facie case), *appeal pending*, No. 24-2558 (2d. Cir. Sept. 26, 2024); *Little v. City of New York Dep't of Fin.*, No. 20-CV-1979, 2022 WL 4539574, at *5 (E.D.N.Y. Sept. 28, 2022) (finding that one month between complaint and termination was sufficient to plead a causal connection at this stage); *Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 319 (E.D.N.Y. 2014) (finding plaintiff carried his burden at this

stage where he plausibly plead a one month gap between his complaint and termination), *aff'd*, 594 F. App'x 29 (2d Cir. 2015).  To the extent that Defendants argue that Plaintiff's failure to follow-up "qualifies as an intervening event that defeats an inference of retaliation[,]" *Rossbach v. Montefiore Med. Ctr.*, No. 19-CV-5758, 2021 WL 930710, at *7 (S.D.N.Y. Mar. 11, 2021), Plaintiff's "failure" does not resemble the type of "misconduct" that courts usually find severs the chain of causation.  *See Emanuel v. Gap, Inc.*, No. 19-CV-03617, 2023 WL 5211007, at *11 (S.D.N.Y. Aug. 14, 2023) (finding the causal chain between protected activity and adverse action severed where it came to light that plaintiff had falsified employee timecards); *Dedewo v. CBS Corp.*, No. 18-CV-9132, 2022 WL 1031588, at *7 (S.D.N.Y. Apr. 5, 2022) (finding the causal chain between the protected activity and adverse action severed where plaintiff filed a discrimination complaint, then took an unsanctioned trip and lied about it to her employer, and was subsequently terminated).  In any case, Defendants' argument ignores that Plaintiff's failure to follow-up comes *after* the adverse action here (the meeting cancelation) and so cannot break the causal chain.

As Plaintiff has established a prima facie case for retaliation, the Court turns to the second stage of the *McDonnell Douglas* framework, where Defendants would normally make a showing of a legitimate, non-discriminatory reason for the adverse action.  Defendants have not made any such argument.  (*See generally* Defs' Mem.; Defs' Reply.)  Accordingly, the Court denies summary judgment on Plaintiff's retaliation claims.  *See Kirkland-Hudson*, 2024 WL 4277940, at *17 (denying summary judgment where there was close temporal proximity of a few months between the protected conduct and adverse action); *Bernardi v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 19-CV-11867, 2023 WL 3230558, at *9 (S.D.N.Y. May 3, 2023) (denying summary judgment where there was close temporal proximity of four days between the

protected conduct and adverse action); *Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 655 (S.D.N.Y. 2015) (denying summary judgment where inconsistencies in contemporaneous reports about the plaintiff's performance along with temporal proximity between the protected activity and adverse action created a triable issue as to whether termination of employee for performance issues was pretext for retaliation).  Accordingly, the Court denies summary judgment on Plaintiff's Section 1981 and NYSHRL retaliation claims to the extent they rely on the December 22, 2022, meeting cancelation.

> b.  February 17, 2023, Application

Plaintiff argues that he "was also retaliated against by Defendants when his February 17, 2023[,] application for the [SACA] position was ignored by and not given the slightest consideration by [] Nonna and [] Capuano."  (Pl's Opp. 17.)  Defendant responds that "Plaintiff cites to no evidence whatsoever that [] Capuano and [] Nonna chose to ignore the application." (Defs' Reply 10.)

The Parties do not discuss or dispute the existence of a protected activity or that Defendants were aware of the activity.  As for the third element, a "[refusal or] [f]ailure to promote can constitute an adverse employment action" in the context of a retaliation claim. *Lomotey v. Conn. Dep't of Transp.*, No. 05-CV-1711, 2009 WL 82501, at *9 (D. Conn. Jan. 12, 2009) (colleting cases), *aff'd*, 355 F. App'x 478 (2d Cir. 2009).  Finally, less than two months passed between the protected activity, December 21, 2022, and the adverse action, the refusal to promote in mid-February 2023.  This is sufficient temporal proximity to satisfy the causation element at the prima facie stage.  *See Kirkland-Hudson*, 2024 WL 4277940, at *17 (denying summary judgment where there was close temporal proximity of a few months between the protected conduct and adverse action).

Defendants argue there was a legitimate, non-discriminatory reason for the failure to promote or consider Plaintiff's February 17, 2023, job application—there was simply not enough time to properly consider his application.  It is undisputed that there were only 7 days, or five business days, between the application and resignation.[5]  (*See* Pl's 56.1 ¶ 372; Defs' 56.1 ¶ 190.)  Capuano testified that she did not review Plaintiff's application because "[he] had already resigned."  (Rahman Decl., Ex. 3 at 335:4–9.)  This suffices to carry Defendants' burden, which "is not a particularly steep hurdle."  *Beauchine v. City of Syracuse*, No. 21-CV-845, 2024 WL 2700874, at *22 (N.D.N.Y. May 24, 2024) (quoting *Hyeck v. Field Support Servs., Inc.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010)).

Plaintiff fails to show that Defendants' failure to consider his application was motivated by discriminatory retaliation.  He argues that Nonna and Capuano "had already acknowledged that Plaintiff was suitable for a promotion . . . and thus there was no legitimate reason for them not to seriously consider Plaintiff's [SACA] application."  (Pl's Opp. 18–19.)  But Plaintiff's speculation as to Defendants' failure to consider his application in a single week is "not enough to demonstrate that the [failure] was pretext, nor is his speculation [as to the same], as the question is not whether Defendant[s'] stated purpose was 'unwise or unreasonable,' but whether the 'articulated purpose is the actual purpose' for the challenged action."  *Wynn v. New Haven Bd. of Educ.*, No. 21-CV-925, 2024 WL 1157148, at *12 (D. Conn. Mar. 18, 2024) (quoting *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2d Cir. 1993)).

---

[5] The Court may take "judicial notice of facts established by a calendar, as the accuracy of a calendar cannot be reasonably questioned."  *Bd. of Educ. of Harrison Cent. Sch. Dist. v. C.S.*, No. 23-CV-8182, 2024 WL 4252499, at *19 n.26 (S.D.N.Y. Sept. 20, 2024) (quoting *Fellows v. Baker*, No. 20-CV-139, 2021 WL 4200875, at *15 n.6 (D. Vt. Mar. 10, 2021), *report and recommendation adopted*, 2021 WL 4199285 (D. Vt. Sept. 15, 2021)).

c.  Litigation Bureau Position

Plaintiff also argues that Defendants' "fail[ure] to inform him about [an open] role in the Litigation Bureau" constituted an adverse action.  (Pl's Opp. 18.)  Plaintiff cites no caselaw in support of the proposition that failure to make an employee aware of an opportunity constitutes an adverse action, (*see generally id.*), and decisions in analogous circumstances cuts against Plaintiff's position, *cf. Malloy v. Pompeo*, No. 18-CV-4756, 2020 WL 5603793, at *16 (S.D.N.Y. Sept. 18, 2020) ("The failure to give an employee an award—by itself—does not constitute an adverse employment action."); *Brierly v. Deer Park Union Free Sch. Dist.*, 359 F. Supp. 2d 275, 300 (E.D.N.Y. 2005) (finding that failure to inform plaintiff in advance that he would not be rehired was not an adverse action because "it is not at all clear how or why this act or omission is sufficiently 'material' or 'tangible' to constitute an 'adverse employment action' under federal law.").  In any case, assuming that Plaintiff has stated a prima facie case, Defendants offer a legitimate, non-discriminatory reason of not informing or offering Plaintiff the Litigation Bureau position:  The head of the bureau, Sullivan, was on medical leave between about January 19, 2023, to February 20, 2023.  (*See* Pl's 56.1 ¶ 380 (indicating that Sullivan returned to the office on February 20, 2023, following an injury).)  Sullivan did not discuss the Litigation Bureau position with Plaintiff because, before Sullivan could do so, "[he] learned that [Plaintiff] had just given his notice that he was leaving the [WCLD]."  (Rahman Decl., Ex. 20 (Dkt. No. 62-20) at 44:8–11.)

As with the February 17, 2023, application, Plaintiff has failed to carry his burden to show that Defendants' supplied reason is pretext for discrimination.  Plaintiff argues simply that Defendants were "fully aware that Plaintiff had a serious interest in working in a different [WCLD] [b]ureau," that "there was nothing stopping [Sullivan] or anyone else from discussing

this opportunity," and instead "Defendants eagerly accepted Plaintiff's letter of resignation." (Pl's Opp. 18.)  Again, this speculation fails to carry Plaintiff's burden at this final step.  *See Wynn*, 2024 WL 1157148, at *12.

Accordingly, the Court grants summary judgment on Plaintiff's Section 1981 and NYSHRL retaliation claims to the extent they concern the February 17, 2023, application and the Litigation Bureau position.  Because the December 22, 2022, meeting cancelation cannot be considered under Title VII, the Court also grants summary judgment with respect to Plaintiff's Title VII retaliation claim.

### 5. Constructive Discharge

"[Constructive discharge] claims 'are difficult to establish,' and 'are routinely rejected by the courts.'" *Tassy v. Buttigieg*, No. 21-CV-577, 2023 WL 144112, at *6 (E.D.N.Y. Jan. 10, 2023) (quoting *Wright v. Goldman, Sachs & Co.*, 387 F. Supp. 2d 314, 325 (S.D.N.Y. 2005)), *aff'd*, No. 23-162, 2024 WL 20647 (2d Cir. Jan. 2, 2024).  "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003) (citations omitted).  For purposes of Title VII, a claim of constructive discharge has two basic elements:  (i) "[a] plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign," and (ii) a plaintiff "must also show that he actually resigned." *Green v. Brennan*, 578 U.S. 547, 555 (2016) (citing *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004)).

As for the first element, a plaintiff must show that a reasonable person would have found the working conditions "intolerable." *See Suders*, 542 U.S. at 134.  A plaintiff cannot satisfy this element by showing "that the working conditions were merely difficult or unpleasant."

*Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498, 506 (S.D.N.Y. 2013) (citation omitted); *see also Green v. Town of E. Haven*, 952 F.3d 394, 404 (2d Cir. 2020) (noting that "constructive discharge cannot be shown simply by the fact that the employee was unhappy with the nature of [his] assignments or criticism of [his] work, or where the employee found the working conditions merely 'difficult or unpleasant'"). A plaintiff must also show that these intolerable working conditions arose under circumstances that support an inference of discriminatory intent. *See Green*, 578 U.S. at 555–56. To do so, a plaintiff must show either "specific intent" or, at the very least, that "the employer's actions were deliberate and not merely negligent or ineffective." *Petrosino v. Bell Atl.*, 385 F.3d 210, 230 (2d Cir. 2004) (cleaned up). "An employee who fails to explore alternative avenues offered by [his] employer before concluding that resignation is the only option cannot make out a claim of constructive discharge." *Simmons-Grant*, 915 F. Supp. 2d at 506 (citation omitted).

Plaintiff argues that the following events suffice to show intolerable working conditions: Being passed over for promotions in 2020, 2021, and 2022; the rejection of his transfer to the Contracts and Real Estate Bureau; being passed over for a vacant SACA position by a candidate who he believes was less qualified than him; being told he needed to engage in community outreach efforts; retaliation following his December 21, 2021, email; Capuano's giving him the silent treatment; and his February 2023 job application being ignored. (*See* Pl's Opp. 24.) On February 15, 2023, Plaintiff accepted an offer of employment from the NYCLD. (Defs' 56.1 ¶ 188.) On February 17, 2023, Plaintiff sent an application for a SACA at the WCLD "because he thought about staying at the WCLD and giving it a shot." (Pl's 56.1 ¶¶ 372–73.) He testified that, "ultimately, [he] wanted to stay, and when [he] saw the advertisement for the position, [he]

decided to give it one last shot."  (Rahman Decl., Ex. 1 (Dkt. No. 62-1) at 255:16–256:6.)

Plaintiff left his job on February 24, 2023.  (Defs' 56.1 ¶ 42.)

Plaintiff's desire to remain at the WCLD indicates that conditions were not so intolerable.

*Cf. Trinidad v. N.Y.C. Dep't of Correction*, 423 F. Supp. 2d 151, 168 (S.D.N.Y. 2006)

("[P]laintiff's testimony establishes that her working conditions were not so intolerable that her

resignation was compelled.  Plaintiff, in fact, viewed her decision to resign as a mistake, and

appears to be aggrieved by the failure to reinstate her following her resignation.").  Plaintiff's

applying for a job at the WLCD two days before his departure cuts against any argument that his

working conditions were "so difficult or unpleasant that a reasonable person in the employee's

shoes would have felt compelled to resign."  *Brandenburg v. Greek Orthodox Archdiocese of N.*

*Am.*, No. 20-CV-3809, 2023 WL 2185827, at *6 (S.D.N.Y. Feb. 23, 2023) (quoting *Chertkova v.*

*Conn. Gen. Life. Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)), *appeal pending*, No. 23-440 (2d Cir.

Mar. 27, 2023).  Indeed, Plaintiff admits that he did not want to resign and wanted to stay at the

WLCD, (Rahman Decl., Ex. 1 at 255:16–256:6).  Even putting aside Plaintiff's willingness to

remain, the record evidence indicates, at most, "difficult or unpleasant" working conditions,

which "are not enough to support a claim of constructive discharge."  *Rutkowski v. Sears*

*Roebuck Corp.*, 210 F.3d 355 (2d Cir. 2000).  Accordingly, the Court grants summary judgment

on Plaintiff's claim of constructive discharge.

### 6.  NYSHRL Aiding and Abetting

Although generally, "claims brought under [the NYSHRL] are analytically identical to

claims brought under Title VII," "[o]ne notable exception to this rule is that, while an individual

defendant . . . may not be held personally liable under Title VII, an individual defendant may be

held liable under the aiding and abetting provision of the NYSHRL if he actually participates in

the conduct giving rise to a discrimination claim." *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (citations and quotation marks omitted), *cert. denied*, 565 U.S. 1260 (2012); *Lopez v. White Plains Hosp.*, No. 19-CV-6263, 2022 WL 1004188, at *16 (S.D.N.Y. Mar. 30, 2022) (same), *aff'd*, No. 22-817, 2022 WL 19835765 (2d Cir. May 16, 2022).  Section 296(6) provides that it is an unlawful discriminatory practice "for any person to aid, abet, incite, compel[,] or coerce the doing of any of the acts forbidden under [the NYSHRL], or attempt to do so."  N.Y. Exec. Law § 296(6).

In order for a defendant to be liable as an aider and abettor under Section 296(6), a plaintiff must first establish the existence of a primary violation of the NYSHRL by an employer or principal.  *See Forrest v. Jewish Guild for the Blind*, 819 N.E.2d 998, 1013 (N.Y. 2004); *Kelly G. v. Bd. of Educ.*, 952 N.Y.S.2d 229, 232 (N.Y. App. Div. 2012); *see also Benson v. Otis Elevator Co.*, 557 F. App'x 74, 77 (2d Cir. 2014) (summary order); *Warren v. Ultimate Fitness Grp., LLC*, No. 19-CV-10315, 2021 WL 4239246, at *5 (S.D.N.Y. Sept. 17, 2021).  "[W]here retaliation can be imputed to the employer, an individual employee can be held liable for aiding and abetting under NYSHRL 'regardless of whether his actions form the basis for [his employer's] liability in the first instance.'" *Bianchi v. Green*, No. 18-CV-619, 2023 WL 5507429, at *7 (N.D.N.Y. Aug. 25, 2023), (quoting *Boston v. Taconic Mgmt.*, No. 12-CV-4077, 2014 WL 4184751, at *2 n.9 (S.D.N.Y. Aug. 22, 2014)).  Courts have found that, under NYSHRL, a sufficient basis for imputing liability on to the employer can be found where a supervisor is involved in the complained of conduct.  *See Accely v. Consol. Edison Co., Inc.*, No. 19-CV-5984, 2022 WL 973415, at *5 (S.D.N.Y. Mar. 31, 2022).

Defendants simply argue that they are entitled to summary judgment because there are no viable underlying claims for discrimination or retaliation.  (Defs' Mem. 24–25.)  Plaintiff,

39

naturally, disagrees.  (Pl's Opp. 25–26.)  As discussed above, there remain viable claims for
discrimination and retaliation, and so they may form the basis of aiding and abetting liability for
Nonna and Capuano.

Because Plaintiff "has raised genuine issues of material fact as to the discrimination and
retaliation claims" and argues that Nonna and Capuano were involved in the alleged adverse
actions (e.g., ratifying discriminatory promotion recommendations and retaliating against
Plaintiff), the Court denies summary judgment on Plaintiff's NYSHRL aiding and abetting
claim.  *Stryker v. HSBC Sec. (USA)*, No. 16-CV-9424, 2020 WL 5127461, at *17 (S.D.N.Y.
Aug. 31, 2020) (denying summary judgment on a NYSHRL aiding and abetting claim where
plaintiff raised genuine issues of material fact); *see also Franco v. City of New York*, No. 19-CV-
5905, 2025 WL 964014, at *14 (E.D.N.Y. Mar. 31, 2025) (denying summary judgment on a
NYSHRL aiding and abetting claim where "plaintiff has raised questions of fact as to whether
[individuals] participated in the conduct underlying the plaintiff's surviving state and city
claims"); *Thompson v. State Farm Mut. Auto. Ins. Co.*, No. 22-CV-8375, 2024 WL 922820, at *6
(S.D.N.Y. Mar. 4, 2024) (denying summary judgment on a NYSHRL aiding and abetting claim
where plaintiff alleged that "[defendant employer], through other employees . . ., was involved in
the challenged decisions.").

### III.  Conclusion

For the reasons set forth above, Defendants' Motion is granted in part and denied in part.
Specifically, the following claims survive:  The Section 1981 and NYSHRL discrimination
claims to the extent they rely on a failure to promote and the Section 1981 and NYSHRL
retaliation claims to the extent they rely on the December 22, 2022, meeting.  The Motion is
granted as to Plaintiff's Title VII and constructive discharge claims.  The Clerk of the Court is

respectfully directed to terminate the pending Motion at Dkt. No. 53.  The Court will hold a

telephonic status conference on October 9, 2025, at 3:30 PM.  Dial-in information can be found

in the Court's Individual Rules.

SO ORDERED.

Dated:    September 24, 2025
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge